**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANTHONY DALE, JOHNNA FOX, BENJAMIN BORROWMAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERY, on behalf of themselves and all others similarly situated,<br><br>    Movants,<br><br>  v.<br><br>EDWARD E. MCNALLY,<br><br>    Respondent. | Case No.<br><br>Underlying action pending in the United States District Court for the Northern District of Illinois, *Dale v. T-Mobile US, Inc.*, Case No. 1:22-cv-03189. |

**MOVANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL COMPLIANCE WITH SUBPOENA TO NONPARTY EDWARD E. MCNALLY**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................... 5

      A.    Movants Challenge the 2020 Merger of T-Mobile and Sprint. ............................ 5

      B.    The Merger Was Approved Based on the Prediction That DISH Would Replace
            Sprint as the Fourth National Carrier. .................................................................. 6

      C.    DISH Fails. ........................................................................................................... 8

      D.    The Monitoring Trustee Created Monthly Reports Regarding Compliance with the
            Post-Merger DOJ Consent Decree. ........................................................................ 9

      E.    Movants Narrowed Their Subpoena to the Monthly Reports, But Mr. McNally
            Has Refused Production. ...................................................................................... 10

III.  LEGAL STANDARD ......................................................................................... 11

IV.   ARGUMENT ...................................................................................................... 12

      A.    The Monthly Reports Are Relevant to Movants' Claims and T-Mobile's Asserted
            Defense. .............................................................................................................. 12

      B.    Mr. McNally's Confidentiality Objections Do Not Warrant Withholding the
            Monthly Reports. ................................................................................................ 16

      C.    The Monthly Reports Created After June 2024 Are Discoverable. ....................... 18

V.    CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biotechnology Value Fund, L.P. v. Celera Corp.*,
  No. 14–4046 PGS, 2014 WL 4272732 (D.N.J. Aug. 28, 2014) ................................................ 11

*Cleckner v. 3M Co.*,
  No. 1:22-cv-02055, 2024 WL 7013975 (M.D. Pa. Nov. 8, 2024) ........................................... 13

*Dale v. Deutsche Telekom AG*,
  No. 1:22-cv-03189, 2023 WL 7220054 (N.D. Ill. Nov. 2, 2023) ................................................ 6

*Dale v. T-Mobile US, Inc.*,
  No. 1:22-cv-03189, 2025 WL 4059967 (N.D. Ill. Oct. 3, 2025) .............................................. 15

*Green v. Cosby*,
  314 F.R.D. 164 (E.D. Pa. 2016) ............................................................................................... 11

*In re Lipitor Antitrust Litig.*,
  Civ. A. No. 12–2389 (PGS), 2013 WL 4500433 (D.N.J. Aug. 21, 2013) ................................. 17

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) .................................................................................................................. 17

*Metex Corp. v. ACS Indus., Inc.*,
  748 F.2d 150 (3d Cir. 1984) ..................................................................................................... 17

*Miller v. Allstate Fire & Cas. Ins. Co.*,
  No. 07–260, 2009 WL 700142 (W.D. Pa. Mar. 17, 2009) ....................................................... 12

*Multiple Energy Techs., LLC v. Under Armour, Inc.*,
  No. 20-664, 2023 WL 2529187 (W.D. Pa. Feb. 21, 2023) ...................................................... 12

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) ........................................................................................ 8

*New York v. Salazar*,
  701 F. Supp. 2d 224 (N.D.N.Y. 2010) ..................................................................................... 17

*Price v. Trans Union, L.L.C.*,
  847 F. Supp. 2d 788 (E.D. Pa. 2012) ....................................................................................... 11

ii

*Takeda Pharm. Co. Ltd. v. Caremark RX, LLC,*
  *2023 WL 6201363 (E.D. Pa. Sept. 22, 2023)* ............................................................. 11

*Vinzant v. United States,*
  No. 2:06–cv–10561, 2010 WL 2674609 (E.D. La. June 30, 2010) ......................... 17

*White v. United States,*
  No. 3:20-cv-00291, 2022 WL 17823681 (M.D. Pa. Dec. 20, 2022) ........................ 16

**Statutes**

15 U.S.C. § 1 ............................................................................................................... 5

15 U.S.C. § 18 .............................................................................................................. 5

**Rules**

Fed. R. Civ. P. 26(b)(1)  ......................................................................................... 11, 12

Fed. R. Civ. P. 45(a)(1)(A)(iii) ................................................................................... 11

Fed. R. Civ. P. 45(c)(2)(A) ......................................................................................... 11

Fed. R. Civ. P. 45(d)(2)(B)(i) ..................................................................................... 11

Movants are plaintiffs in the antitrust class action, *Dale v. T-Mobile US, Inc.*, No. 1:22-cv-03189, pending in the Northern District of Illinois. They respectfully move to compel production in response to their subpoena to nonparty Edward E. McNally. In the underlying action, Movants challenge the 2020 merger of T-Mobile US, Inc. ("T-Mobile") and Sprint Corp. ("Sprint") as a violation of the federal antitrust laws. Mr. McNally is the court-appointed Monitoring Trustee charged with overseeing compliance with the consent decree entered in connection with the merger—including T-Mobile's asset divestiture obligations and DISH Network's ("DISH") progress toward replacing Sprint as the fourth national mobile wireless services carrier. As Monitoring Trustee, Mr. McNally possesses highly relevant documents about DISH's failure to do so, namely monthly monitoring reports he and his predecessor created. Movants seek production of these reports. Mr. McNally has refused to produce them, despite having no plausible burden claim or any other basis for doing so. The motion should be granted.

## I.    INTRODUCTION

In the underlying action, Movants challenge the 2020 T-Mobile-Sprint merger as a violation of the federal antitrust laws.[1] They argue that the merger made a bad situation worse: combining the third and fourth largest competitors in the national retail mobile wireless service market, lessening competition, and leading to higher prices for mobile wireless customers. The merger increased market concentration so much that it triggered a presumption of illegality. To get the merger approved, T-Mobile told federal regulators and the U.S. District Court for the Southern District of New York that it would divest a package of assets to DISH—including Sprint's prepaid businesses and wireless spectrum licenses—and give DISH access to T-Mobile's

---

[1] Ex. A, *Dale v. T-Mobile US, Inc.*, No. 1:22-cv-03189 (N.D. Ill. June 17, 2022), ECF No. 1 ("Complaint").

1

network for seven years. T-Mobile assured regulators that the divestiture and other commitments would make DISH a vibrant new fourth competitor that would more than replace Sprint. A consent decree formalized these commitments and appointed a Monitoring Trustee to assess T-Mobile's compliance and DISH's progress. *See* Ex. B, Final J., *United States v. Deutsche Telekom AG* ("*DOJ Action*"), No. 1:19-cv-02232 (D.D.C. Apr. 1, 2020), ECF No. 85 ("Consent Decree").[2] T-Mobile and DISH provided regular compliance updates to the Monitoring Trustee, who in turn provided monthly reports to the DOJ.

Movants seek production of these monthly reports. The reports are highly relevant to Movants' case. As has become well-known by now, DISH utterly failed to grow into the vibrant fourth wireless carrier T-Mobile told regulators would replace the competition the merger eliminated. DISH hemorrhaged millions of subscribers and served most of the remaining ones not by building its own fourth network, but by renting network access from T-Mobile and AT&T. It has since exited the market for national retail mobile wireless services and sold off its wireless spectrum assets. DISH's collapse led the DOJ, on May 19, 2026, to move to terminate the network buildout obligation of DISH's parent company EchoStar Corp.'s ("EchoStar") under the Consent Decree. [3] The court granted the motion on July 15, 2026. Second Am. Final J., *DOJ Action*, ECF No. 152. As the DOJ acknowledged, "there is no available outcome that would allow EchoStar to continue as a mobile radio network operator." Ex. C, DOJ Mem. at 3, 14, *DOJ Action*, ECF No. 149.

---

[2] *See also* Am. Final J., *DOJ Action*, ECF No. 139 (Oct. 23, 2023) (amending the Consent Decree to extend DISH's deadline to acquire certain spectrum licenses); Second Am. Final J., *DOJ Action*, ECF No. 152 (July 15, 2026) (amending the Consent Decree further to relieve DISH's parent company, EchoStar, of its mobile wireless network buildout obligations).

[3] Ex. C, Mem. in Supp. of Unopposed Mot. of the U.S. for Partial Termination of Am. Final J., *DOJ Action*, ECF No. 149 ("DOJ Mem.").

2

The monthly reports describe the events leading up to this fiasco and are highly probative of the competitiveness of the national retail mobile wireless service market. They thus speak directly to the claims at issue in the underlying litigation. Movants more than satisfy Rule 26(b)(1)'s relevance standard.

Production of the reports is also proportionate to the needs of the case. The reports are a narrow, well-defined category of documents. They are limited in number; at most, there exist *no more than 80* of them—one per month from January 2020, when the Monitoring Trustee was first appointed, through the present. Mr. McNally, as the current court-appointed Monitoring Trustee, has easy access to them. He created several of the reports himself and represents that he possesses a substantial number, if not all, of the reports created by his predecessor, Theodore Ullyot.

Mr. McNally does not even argue that there is any burden in collecting and producing the reports. There is none. Instead, he refuses to produce them on three grounds, each of which lacks merit.

*First*, Mr. McNally argues that the monthly reports are not relevant because he "does not analyze competition generally" in the market. This is wrong. The monthly reports describe key inputs that, as the DOJ and industry commentators have acknowledged, bear on the competitiveness of the national retail mobile wireless service market. These inputs measure DISH's progress toward becoming the fourth national wireless carrier, which the merging parties and DISH promised would replace the competition lost by consolidating T-Mobile and Sprint.

*Second*, Mr. McNally contends that the subpoena seeks confidential documents and speculates that Movants would be unable to obtain them through a Freedom of Information Act ("FOIA") request. This is another red herring; Mr. McNally is not the government, and this is not

3

an action to compel FOIA compliance. This motion concerns a subpoena that seeks documents plainly within the scope of Rule 26, and any confidentiality interests can be safeguarded by the robust confidentiality order in place in the underlying action.

*Third*, Mr. McNally refuses to produce any monthly reports created after the custodial document production period agreed to by T-Mobile and other nonparties in this action, which runs until at least June 2024. This objection should be rejected. DISH's parent company, EchoStar, sold off the spectrum it had acquired to replace Sprint, the DOJ moved to terminate EchoStar's remaining buildout obligation, and the court granted that motion—*after* June 2024. Reports from after June 2024 are therefore highly relevant, and Mr. McNally offers nothing to suggest otherwise. Moreover, the Monitoring Trustee created only roughly two dozen monthly reports between June 2024 and the present. So unlike T-Mobile and the other nonparties, which are collecting and producing hundreds of thousands of documents that have been culled by search terms and responsiveness review, producing these documents would not impose any meaningful burden.

The Court should grant the motion and order Mr. McNally to produce the monthly reports for the full period requested, January 2020 through the present.

4

## II.   FACTUAL BACKGROUND

### A.   Movants Challenge the 2020 Merger of T-Mobile and Sprint.

The underlying class action challenges the 2020 merger of T-Mobile and Sprint under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* Ex. A, Complaint ¶ 1. Movants are customers of Verizon and AT&T who seek damages for the inflated prices they have paid for national retail mobile wireless service as a result of the merger. *Id.* ¶¶ 8, 12, 14–18.

Prior to the merger, T-Mobile and Sprint operated as "maverick" competitors that drove vigorous competition among national mobile wireless carriers. *Id.* ¶¶ 2, 35. The merger consolidated the number of national mobile wireless carriers from four to three, combining two fierce competitors into a single entity. *Id.* ¶ 1. Since the merger, the three major carriers have split the market: In 2025, T-Mobile served over 133.9 million customers[4] and earned over $68.4 billion in annual wireless service revenues.[5] That same year, Verizon served over 116 million subscribers and earned more than $83.7 billion in wireless service revenues.[6] And AT&T served 109 million subscribers in the U.S. and earned over $67.3 billion in wireless service revenues.[7]

---

[4] T-Mobile, Press Release: "T-Mobile Delivers Best-in-Class Customer Results in Q4, Translating into Durable and Profitable Financial Growth Driven By Widening Differentiation" (Feb. 11, 2026), https://www.t-mobile.com/news/business/t-mobile-q4-2025-earnings (excluding broadband customers and equipment revenues).

[5] T-Mobile, 2025 Annual Report at 36 (Feb. 11, 2026), available at https://s29.q4cdn.com/310188824/files/doc_financials/2025/ar/2025-TMUS-Annual-Report-Final-Web.pdf.

[6] Verizon Commc'ns Inc., FY 2025 Annual Report (Form 10-K) at 4, 8, 99 (Feb. 17, 2026), available at https://www.verizon.com/about/sites/default/files/2025-Annual-Report-on-Form-10k.pdf (reporting $106.8 billion in revenue generated in Verizon's consumer segment, of which roughly 90%—or approximately $96 billion—is attributable to retail wireless connections, excluding equipment revenue).

[7] AT&T, 2025 Annual Report at 3, 20, 22–23, 27–28 (Feb. 11, 2026), available at https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/annual-

5

Because the three surviving carriers lack the incentive to compete as vigorously for subscribers, Movants allege that they have paid prices that have been inflated and stabilized at supracompetitive levels. Ex. A, Complaint ¶¶ 7, 80. In particular, all three carriers have imposed price increases that have extracted billions in overcharges from their customers. *Id.* ¶¶ 8, 83, 102–05, 107–08.[8]

Movants filed the underlying action in 2022, and in 2023 the district court denied T-Mobile's motion to dismiss for failure to state a claim. *See Dale v. Deutsche Telekom AG*, No. 1:22-cv-03189, 2023 WL 7220054 (N.D. Ill. Nov. 2, 2023). The Seventh Circuit then denied T-Mobile's petition for leave to file an interlocutory appeal. Order, *In re T-Mobile USA, Inc.*, No. 24-8013 (7th Cir. May 16, 2024), ECF No. 19. Since then, the parties have engaged in fact discovery, which will conclude on February 26, 2027. *See* Mar. 12, 2026 Minute Entry, *Dale*, ECF No. 370.

### B.     The Merger Was Approved Based on the Prediction That DISH Would Replace Sprint as the Fourth National Carrier.

When T-Mobile and Sprint—then the third and fourth largest competitors in the national retail mobile wireless service market—proposed to merge, the resulting consolidation so concentrated the market that it triggered a presumption of illegality. Ex. A, Complaint ¶¶ 1, 51. The four-to-three merger accordingly drew challenges from both federal and state antitrust enforcers. In July 2019, the DOJ filed a complaint recognizing that U.S. mobile wireless

---

reports/2025/2025-annual-report-complete.pdf (91% of AT&T's customers are retail wireless subscribers; reported revenue excludes equipment revenue).

[8] *See also* Mike Dano, *US Mobile Prices Sky High After T-Mobile's Sprint Buy—Report*, LIGHT READING (May 14, 2024), https://www.lightreading.com/operations/us-mobile-prices-sky-high-after-t-mobile-s-sprint-buy-report (summarizing research finding that consumers have paid higher prices following the merger).

consumers "have benefitted" from the competitive presence of T-Mobile and Sprint and concluding that "if the merger were allowed to proceed, this competition would be lost." Ex. A, Complaint ¶ 63 (quoting Compl. ¶¶ 17, 21, *DOJ Action*, ECF No. 1). The DOJ never litigated its challenge. Rather, the DOJ entered into a final judgment with T-Mobile that formalized T-Mobile's post-merger commitments, which were intended to enable DISH to replace Sprint as the fourth national wireless carrier. *See* Ex. A, Complaint ¶¶ 4, 63–64; Ex. B, Consent Decree, *DOJ Action*, ECF No. 85. Specifically, T-Mobile was required to divest Sprint's prepaid wireless service businesses and substantial spectrum assets to DISH; make available for divestiture to DISH at least 20,000 decommissioned cell sites and hundreds of retail locations; and provide DISH with access to the T-Mobile network for seven years while DISH transitioned the acquired business and built out its own 5G network. *See* Ex. A, Complaint ¶ 64; Ex. B, Consent Decree §§ IV.A–D, VI.A, VIII.A, *DOJ Action*, ECF No. 85.

A coalition of state attorneys general separately sued to enjoin the merger on the ground that the consolidation would be anticompetitive and harm consumers notwithstanding the proposed divestitures. *See New York v. Deutsche Telekom AG* ("*State AG Action*"), No. 1:19-cv-05434 (S.D.N.Y.). At trial, T-Mobile relied heavily on the Consent Decree remedies to rebut the structural presumption of the merger's illegality. This included calling DISH Chairman Charles Ergen as a witness to testify that DISH would be a strong fourth national carrier "from day one."[9] Following a bench trial, the court declined to enjoin the merger, relying heavily on the promise by T-Mobile, DISH, and Mr. Ergen that DISH would replace Sprint as the fourth national carrier. Specifically, the court found that the proposed divestiture and related remedies left DISH "well poised to become a fourth MNO [mobile network operator] in the market," such that "its

---

[9] Dec. 17, 2019 Trial Tr. at 1561:24-1562:2, *State AG Action*, ECF No. 390.

extensive preparations and regulatory remedies indicate that it can sufficiently replace Sprint's competitive impact." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 229 (S.D.N.Y. 2020).

### C.    DISH Fails.

Those predictions did not pan out: DISH's network buildout never materialized, and it hemorrhaged subscribers.[10] Rather than building its promised fourth network, DISH served the majority of its subscribers by renting network capacity from its purported competitors, first T-Mobile, and later AT&T. *See* Ex. A, Complaint ¶¶ 91, 95, 97. In August and September 2025, DISH's parent company, EchoStar, agreed to sell substantially all of the wireless spectrum on which its independent network was to be built—approximately $23 billion to AT&T and roughly $19.6 billion to SpaceX—foreclosing any scenario in which DISH could emerge as a viable fourth competitor. Ex. C, DOJ Mem. at 9–10, *DOJ Action*, ECF No. 149.[11] The DOJ has since moved to terminate EchoStar's network buildout obligation under the Consent Decree, acknowledging that the spectrum sales will "necessarily result in EchoStar shutting down its radio network" and that relieving EchoStar of its obligation was "the best outcome for competition under the circumstances." *Id.* at 3, 14; *see also id.* at 17 (arguing that terminating EchoStar's network buildout obligation "aligns the requirements of this Court's order with the

---

[10] Ex. A, Complaint ¶ 90; Sue Marek, *Dish Drops Another 210k Wireless Subs in Q2*, FIERCE WIRELESS (Aug. 3, 2022), https://www.fierce-network.com/wireless/dish-drops-another-210k-wireless-subs-2q; Linda Hardesty, *Dish Loses 225,000 Wireless Subs in Q3 2023*, FIERCE NETWORK (Nov. 6, 2023), https://www.fierce-network.com/wireless/dish-loses-225000-wireless-subs-q3-2023.

[11] *See also* EchoStar, *EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's (FCC) Inquiries* (Aug. 26, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network.

consequences of EchoStar's failure"). The *DOJ Action* court granted the motion and entered the Second Amended Final Judgment on July 15, 2026. *See* Second Am. Final J., *DOJ Action*, ECF No. 152.

T-Mobile had a hand in DISH's demise. T-Mobile had promised to make its CDMA network—relied on by most of the customers T-Mobile divested to DISH to secure merger approval—available to DISH for three to five years after the merger closed. Ex. A, Complaint ¶¶ 95–96. But T-Mobile then prematurely *shut down* its CDMA network in March 2022,[12] forcing DISH to rent network access from its competitor, AT&T.[13] In response to T-Mobile's brazen about-face, the California Public Utilities Commission imposed a $5.3 million penalty on T-Mobile for making false representations in connection with the merger review.[14]

**D.     The Monitoring Trustee Created Monthly Reports Regarding Compliance with the Post-Merger DOJ Consent Decree.**

The Consent Decree provided for the appointment of a Monitoring Trustee to oversee T-Mobile's and DISH's compliance. *See* Ex. B, Consent Decree § XII, *DOJ Action*, ECF No. 85. Although the Monitoring Trustee is compensated by T-Mobile on terms subject to DOJ approval, *id.* § XII.E, he reports directly to the United States and operates independently of the parties whose compliance he oversees, *id.* § XII.H. Theodore Ullyot served in this role from January 2020 until April 2025, when he was replaced by Mr. McNally, a partner at the New York office

---

[12] "CDMA" stands for Code Division Multiple Access, a type of radio network used by certain wireless carriers, including DISH. *See* Ex. A, Complaint ¶¶ 6, 95.

[13] Ex. A, Complaint ¶¶ 6, 91, 95–97, 101; T-Mobile, T-Mobile Network Evolution (2026), https://www.t-mobile.com/support/coverage/t-mobile-network-evolution.

[14] Decision Finding that T-Mobile USA, Inc. Should Be Sanctioned by the Commission for Violating Rule 1.1 of the Commission's Rules of Practice and Procedure, Nos. 18-07-011, 18-07-012, at 2, 11–18 (Cal. Pub. Util. Comm'n Apr. 25, 2022), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M471/K485/471485763.PDF.

of the law firm Kasowitz LLP. *DOJ Action*, Apr. 16, 2025 Minute Order. The Monitoring Trustee has the "authority to monitor [T-Mobile and DISH's] compliance with the terms" of the Consent Decree: T-Mobile's sale of its prepaid wireless business assets, including Boost Mobile, to DISH; T-Mobile's compliance with obligations to make cell sites and retail locations available to DISH; and DISH's "progress toward using" those assets, along with other company assets, "to operate a retail mobile wireless network." *See* Ex. B, Consent Decree § XII.B, *DOJ Action*, ECF No. 85.

Relevant to this motion, the Consent Decree requires the Monitoring Trustee to "file reports monthly, or more frequently as needed, with the United States setting forth Defendants' efforts to comply with Defendants' obligations under [the] Final Judgment and under the Stipulation and Order." *See* Ex. B, Consent Decree § XII.H, *DOJ Action*, ECF No. 85. Mr. McNally has represented that he has a substantial number, if not all, of the monthly reports within his possession, custody, or control, including monthly reports created by his predecessor, Mr. Ullyot. *See* Ex. D, Pls.' Mar. 13, 2026 Ltr. at 1.

### E.     Movants Narrowed Their Subpoena to the Monthly Reports, But Mr. McNally Has Refused Production.

On July 11, 2025, Movants served a subpoena with ten document requests on Mr. McNally. *See* Ex. E, Pls.' July 11, 2025 Subpoena. The parties met and conferred on February 19, 2026. On April 22, 2026, Movants served a narrower amended subpoena that sought only the monthly reports—specifically, "[a]ll reports . . . created pursuant to Section XII.H of the DOJ Consent Decree during the Relevant Time Period," from January 2020 through the present. *See* Ex. F, Pls.' Apr. 22, 2026 Am. Subpoena. Mr. McNally objected on May 6, 2026, refusing to produce the monthly reports. *See* Ex. G, McNally's May 6, 2026 Objections to Am. Subpoena.

10

Following a second meet-and-confer teleconference on May 13, 2026, the parties reached impasse.[15]

### III.    LEGAL STANDARD

The Federal Rules confer broad rights to seek relevant discovery from nonparties like Mr. McNally. Under Rule 45, a party may command a nonparty to "produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii). A party seeking to compel compliance with a subpoena under Rule 45 may "move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i).[16]

The standard for discoverability under Rule 26(b)(1) applies to subpoenas for the production of documents under Rule 45. *Price v. Trans Union, L.L.C.*, 847 F. Supp. 2d 788, 793 (E.D. Pa. 2012). Accordingly, the subpoenaing party may seek "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *Green v. Cosby*, 314 F.R.D. 164, 169 (E.D. Pa. 2016). Once the moving party has established that the subpoena seeks relevant material, the burden shifts to the responding party to "explain why discovery should not be permitted." *Biotechnology Value Fund, L.P. v. Celera*

---

[15] As required by Local Civil Rule 26.1(f), the undersigned certifies that counsel conferred in good faith and were unable to resolve this dispute without the Court's intervention. *See* Declaration of Jeremy Gradwohl in Support of Movants' Motion to Compel Compliance with Subpoena to Nonparty Edward E. McNally ¶ 13 ("Gradwohl Decl.").

[16] Movants seek to enforce compliance in this Court because it is the district in which the Philadelphia-based location of compliance listed in the subpoena is located. Ex. F, Apr. 22, 2026 Am. Subpoena; *Takeda Pharm. Co. Ltd. v. Caremark RX, LLC*, No. 23-mc-111, 2023 WL 6201363, at *2 (E.D. Pa. Sept. 22, 2023) ("the place named in the subpoena . . . is the place where compliance is required"). Compliance in Philadelphia is appropriate because Philadelphia is within 100 miles of the New York office of Kasowitz LLP where Mr. McNally "is employed." Fed. R. Civ. P. 45(c)(2)(A); *see* Gradwohl Decl. ¶ 14 (approximately 84 miles straight-line distance).

*Corp.*, No. 14–4046 PGS, 2014 WL 4272732, at *1 (D.N.J. Aug. 28, 2014) (quoting *Miller v. Allstate Fire & Cas. Ins. Co.*, No. 07–260, 2009 WL 700142, at *2 (W.D. Pa. Mar. 17, 2009)).

## IV.   ARGUMENT

The Court should compel Mr. McNally to produce the monthly reports because they are a discrete set of documents—no more than 80—and bear directly on Movants' claim that the merger has reduced competition in the national retail mobile wireless service market. Indeed, Mr. McNally does not claim that the documents are privileged or that collecting and producing them would be burdensome.[17] Rather, Mr. McNally objects to production on three grounds: (a) that the reports are not relevant; (b) that Movants failed to request the documents under the FOIA; and (c) that the monthly reports post-dating June 2024 exceed the time period for which *other parties* agreed to collect and produce vast quantities of documents, including emails, spreadsheets, and slide decks from dozens of custodians. *See* Ex. H, McNally's Apr. 6, 2026 Ltr. Each objection lacks merit.

### A.  The Monthly Reports Are Relevant to Movants' Claims and T-Mobile's Asserted Defense.

The monthly reports fall within the Federal Rules' broad definition of permissible relevant discovery. Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *E.g.*, *Multiple Energy Techs., LLC v. Under Armour, Inc.*, No. 20-664, 2023 WL 2529187, at *2 (W.D. Pa. Feb. 21, 2023), *report & recommendation adopted as modified*, 2023 WL 2527334 (W.D. Pa. Mar. 15, 2023). The standard for relevancy under Rule 26(b)(1) is

---

[17] As explained below, any burden-related arguments arise from Mr. McNally's confidentiality-based objections, not from any difficulty in collecting or producing the monthly reports. *See* Ex. H, McNally's Apr. 6, 2026 Ltr. at 2 n.2 ("[T]he burden on Mr. McNally is not related to collecting the Monthly Reports . . . .").

"broad." *Cleckner v. 3M Co.*, No. 1:22-cv-02055, 2024 WL 7013975, at *3 (M.D. Pa. Nov. 8, 2024).

The merger reduced the national retail mobile wireless market from four major carriers to three, and both the DOJ and *State AG Action* trial court approved it on the premise that DISH would step into the fourth position vacated by Sprint. A central issue in the underlying action is therefore whether DISH in fact posed, or was capable of posing, a competitive threat to the three remaining national carriers, or whether, instead, the market became less competitive after the merger.

Movants' Complaint alleged the latter: contrary to pre-merger promises, the national retail wireless market became less competitive after the merger. Although "T-Mobile, Sprint, and DISH promised during the trial that DISH would emerge as a fourth major competitor" in the market, Movants alleged that "future competition from DISH may never exist, and certainly has not stood as a remedy for the loss of competition caused by the merger to date." Ex. A, Complaint ¶ 90. There was pre-merger evidence that called into doubt whether T-Mobile's divestiture of the Boost Mobile brand would actually preserve competition. Movants alleged that DISH's "future as a mobile wireless provider does not look any better" because it "is poised to lose even more subscribers," *id.* ¶ 91; that while DISH "still claims it will build a greenfield 5G network" using "untried technology," it appears "focused on generating cash short-term by cutting costs and pulling back on subscriber acquisition while taking hits to its subscriber base," *id.* ¶ 92; that "it would not make economic sense for DISH to build its own network," *id.* ¶ 93; and that "rather than trying to compete in the relevant market, DISH may simply wait out the six-year DOJ consent decree and then proceed to sell its spectrum holdings," *id.* ¶ 94. And that last prediction is exactly what transpired. DISH never built a competitive fourth network; rather,

13

EchoStar sold substantially all of the underlying spectrum to AT&T and SpaceX in late 2025, and the court in the *DOJ Action* has since terminated EchoStar's network buildout obligation under the Consent Decree. *See* Second Am. Final J., *DOJ Action*, ECF No. 152.

The monthly reports likely contain information relevant to each of these points. The reports were furnished as a condition of the DOJ's merger approval and provide month-by-month updates on compliance with the conditions designed to make DISH a fourth national carrier—including T-Mobile's divestiture obligations, decommissioned cell sites and retail locations, and DISH's progress toward using those assets to operate a retail mobile wireless network. They thus bear directly on whether DISH posed, or was capable of posing, a competitive threat after the merger, and are relevant to Movants' claim that the merger made the market less competitive and T-Mobile's asserted defense based on the DOJ's merger approval. *See* T-Mobile's Answer to Class Action Compl. at 38, *Dale*, ECF No. 146.

Indeed, there is ample reason to believe that the monthly reports will show that T-Mobile and DISH have not complied with their pre-merger regulatory commitments. Before the merger, T-Mobile had promised to make its CDMA network—the network most of the customers it divested to DISH depended on—available to DISH for three to five years after the merger closed in order to support DISH's launch of its business. But T-Mobile then prematurely *shut down* its CDMA network in March 2022, forcing DISH to rent network access from its purported competitor, AT&T. *See supra* n.13. In response to T-Mobile's brazen about-face, the California Public Utilities Commission imposed a $5.3 million penalty on T-Mobile for making false representations in connection with the merger review. *See supra* n.14. EchoStar's subsequent inability to meet its FCC network buildout commitments, which prompted the court's termination of EchoStar's network buildout obligation entirely, underscores that the regulatory

14

commitments made at the merger's approval were not honored in operation. *See* Second Am. Final J., *DOJ Action*, ECF No. 152.

The court in the underlying action has already recognized that discovery into these issues is proper, finding that documents probative of DISH's ability to compete against the three remaining national wireless carriers are relevant. Specifically, in granting a motion to compel, the court found that evidence of "the wireless services landscape after the merger was completed, including . . . DISH's ability to compete with other [mobile network operator] carriers" is discoverable. *Dale v. T-Mobile US, Inc.*, No. 1:22-cv-03189, 2025 WL 4059967, at *2 (N.D. Ill. Oct. 3, 2025). The court has further ordered DISH to produce its correspondence with the Monitoring Trustee, remarking that such documents "are clearly relevant to the allegations in the complaint and will be helpful in showing that the 2020 merger altered competition in a way that allowed AT&T and Verizon to maintain higher prices for their customers." Oct. 3, 2025 Or., *Dale*, ECF No. 338 at 5; *see also id.* at 11 (noting "the important role DISH played in the merger's ratification").

Nonetheless, Mr. McNally contends that the monthly reports are not relevant because the Monitoring Trustee "does not analyze competition generally in the mobile wireless retail network market." Ex. H, McNally's Apr. 6, 2026 Ltr. at 1. This objection is myopic. The reports are relevant because they track conditions that show whether and to what extent DISH ever operated as a competitor to the nationwide mobile network providers. Mr. McNally concedes that the Monitoring Trustee tracks "T-Mobile's divestiture of certain assets and compliance with its requirements to make decommissioned cell sites and retail locations available to DISH, and DISH's progress toward using certain assets to operate a retail mobile wireless network." Ex. D, Pls.' Mar. 13, 2026 Ltr. at 2 (quoting Ex. I, McNally's Dec. 22, 2025 Ltr. at 2). All of these

15

factors bear upon DISH's competitiveness in the national retail wireless services market. *See id.*; *see also* Ex. J, Pls.' Oct. 17, 2025 Ltr. at 4–5. Indeed, the DOJ relied on precisely these issues— DISH's network buildout, spectrum deployment, and operational viability as a facilities-based carrier—in its May 19, 2026 motion to terminate EchoStar's network buildout obligation, concluding that the AT&T and SpaceX transactions "represent the best outcome for competition under the circumstances." Ex. C, DOJ Mem. at 3, 14, *DOJ Action*, ECF No. 149. Industry commentators have similarly tied DISH's access to wireless spectrum to its overall competitive position.[18] In short, the reports need not contain a formal antitrust market analysis to be relevant to the overall competitiveness of the national retail mobile wireless service market.

**B.     Mr. McNally's Confidentiality Objections Do Not Warrant Withholding the Monthly Reports.**

Mr. McNally refuses to produce the monthly reports on the ground that Movants' subpoena "is an effort to avoid any FOIA objections and related motion practice to obtain materials that may otherwise be withheld from Plaintiffs." Ex. H, McNally's Apr. 6, 2026 Ltr. at 2. At least three reasons warrant overruling this objection.

***First***, as Mr. McNally concedes, FOIA has no bearing on the discoverability of the monthly reports; the Federal Rules control. *See* Ex. H, McNally's Apr. 6, 2026 Ltr. at 2 ("Mr. McNally does not object to Movants' requests based on FOIA, and we do not dispute the fact that disclosure under FOIA and civil discovery is distinct."); *see also White v. United States*, No. 3:20-cv-00291, 2022 WL 17823681, at *2 (M.D. Pa. Dec. 20, 2022), *on reconsideration in part*,

---

[18] *See, e.g.*, Emma Roth, *Dish Gives Up on Becoming the Fourth Major Wireless Carrier*, THE VERGE (Aug. 26, 2025), https://www.theverge.com/report/766038/dish-echostar-spectrum-att-sale-fourth-carrier; John Celentano, *The U.S. 4th National Wireless Network Is Dead*, INSIDE TOWERS (Sept. 11, 2025), https://insidetowers.com/the-u-s-4th-national-wireless-network-is-dead/.

16

2023 WL 3851982 (M.D. Pa. June 6, 2023) ("FOIA does not govern civil discovery disclosures . . . ."); *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989) ("[T]he FOIA was not intended to supplement or displace rules of discovery."); *New York v. Salazar*, 701 F. Supp. 2d 224, 234 (N.D.N.Y. 2010), *aff'd*, 2011 WL 1938232 (N.D.N.Y. Mar. 8, 2011) (FOIA and civil discovery under Rule 26 "are intellectually distinct"). Mr. McNally is a private citizen, not a government employee. The FOIA is a red herring.

*Second*, no authority obligates Movants to seek the monthly reports through the FOIA when that material is otherwise discoverable from a private party under the Federal Rules of Civil Procedure. *See Vinzant v. United States*, No. 2:06–cv–10561, 2010 WL 2674609, at *9 (E.D. La. June 30, 2010) ("Though information available under the FOIA is likely to be available through discovery, information unavailable under the FOIA is not necessarily unavailable through discovery." (citation omitted)). Indeed, Mr. McNally has never attempted to substantiate his confidentiality-based justification for withholding the monthly reports beyond conclusory assertions that they are "confidential materials submitted only to DOJ as part of their ongoing investigation." *See* Ex. H, McNally's Apr. 6, 2026 Ltr. at 2 n.2.

*Third*, confidentiality is not a basis to withhold discoverable material wholesale. The proper way to address these concerns is through a "carefully tailored protective order under Fed. R. Civ. P. 26(c)." *Metex Corp. v. ACS Indus., Inc.*, 748 F.2d 150, 154 n.6 (3d Cir. 1984). Here, the court in the underlying action entered a robust confidentiality order that permits a producing party to designate a document as "Confidential" or "Highly Confidential." *See* Ex. K, Am. Agreed Confidentiality Or., *Dale*, ECF No. 336. Any "concerns regarding confidentiality" that Mr. McNally may assert over the monthly reports "can be adequately addressed" through designation under this order. *E.g.*, *In re Lipitor Antitrust Litig.*, Civ. A. No. 12–2389 (PGS), 2013

17

WL 4500433, at *5 (D.N.J. Aug. 21, 2013). Indeed, T-Mobile and several other nonparties have produced millions of pages of sensitive business documents under the order's protection. Movants have offered and remain willing to work with Mr. McNally to reach an appropriate confidentiality designation for the monthly reports. Ex. D, Pls.' Mar. 13, 2026 Ltr. at 3.

### C.      The Monthly Reports Created After June 2024 Are Discoverable.

Mr. McNally further objects to producing monthly reports created after the relevant end-date for the discovery time periods applicable to T-Mobile and DISH, which in DISH's case is no earlier than June 2024.[19] Yet, Mr. McNally does not argue that monthly reports from this period would be any less relevant or more burdensome to produce. Rather, the opposite is true on both counts.

As to relevance, monthly reports created since June 2024 are highly relevant given that the post-June 2024 period is when the merger's fourth-carrier remedy visibly failed. The DOJ's chronology of EchoStar's failure in its recent motion to terminate the company's network buildout obligation under the Consent Decree takes place entirely within this latter period: from EchoStar's September 2024 FCC extension requests through the May 2025 FCC compliance review and August and September 2025, when EchoStar sold for over $42 billion the spectrum on which DISH's independent nationwide network was to be built. *See* Ex. C, DOJ Mem. at 4–

---

[19] While DISH contends that its relevant discovery period ends in June 2024, when the court in the underlying action granted Movants' motion to compel DISH to produce relevant documents, it limited the temporal scope of Movants' subpoena to DISH's post-merger documents—but did not specify an end date. *See* Oct. 3, 2025 Or., *Dale*, ECF No. 338 at 6 ("Therefore, the Court modifies the subpoena to only include documents beginning on the date the T-Mobile/Sprint merger became official – April 1, 2020."). Accordingly, the relevant discovery period for DISH runs *at least* through June 2024, but does not necessarily end in June 2024.

14, *DOJ Action*, ECF No. 149.[20] The monthly reports covering this window are therefore among the most probative in the set.

As to burden, Movants negotiated discovery cutoffs for T-Mobile and nonparties such as DISH because these parties will each produce hundreds of thousands of documents that must be collected and culled by search terms and responsiveness review. By contrast, Movants seek a discrete category of documents—no more than 80 monthly reports total, with 25 created since June 2024. These documents presumably exist in a centralized location, and, as Mr. McNally concedes, they can be retrieved with minimal burden. *See* Ex. H, McNally's Apr. 6, 2026 Ltr. at 2 n.2. Mr. McNally has cited no authority for the proposition that he can shirk his obligation to produce responsive material simply because the material was created later than the time period for which *other parties* agreed to produce documents. Moreover, Movants are seeking a limited production of documents from T-Mobile that *includes* the post-June 2024 time period. *See* July 15, 2026 Joint Status Report at 2, *Dale*, ECF No. 381. Thus, a June 2024 time-period cutoff is not appropriate here.

## V.   CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant their Motion To Compel Compliance With Subpoena to Nonparty Edward E. McNally and order Mr. McNally to produce all monthly reports within his possession, custody, or control that were prepared January 2020 through the present by the Monitoring Trustee appointed in *United States v. Deutsche Telekom AG*, No. 1:19-cv-02232 (D.D.C.).

---

[20] *See also* Ex. D, Pls.' Mar. 13, 2026 Ltr. at 3 & n.5; *supra* n.18 (collecting public reporting linking the August and September 2025 EchoStar wireless spectrum sale with DISH's competitive standing in the national retail mobile wireless service market).

Dated: July 22, 2026

Respectfully submitted,

*/s/ Jeremy Gradwohl*
Jeremy Gradwohl
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-5801
jgradwohl@bergermontague.com

Kyla Gibboney (*pro hac vice* forthcoming)
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Phone: (415) 689-9292
kgibboney@bergermontague.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94104
Phone: (267) 702-2318
gsmith@hausfeld.com

Daniel P. Margolskee
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Phone: (215) 985-3270
dmargolskee@hausfeld.com

Shana R. Herman
**HAUSFELD LLP**
1200 17th Street NW, Suite 600
Washington, D.C. 20036
Phone: (202) 540-7200
sherman@hausfeld.com

*Counsel for Movants Anthony Dale, Johnna*
*Fox, Benjamin Borrowman, Ann Lambert,*
*Robert Anderson, and Chad Hohenbery*

20